The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
January 2, 2020

**2020COA1**

**No. 15CA0648, _People v. Dominguez-Castor_ — Constitutional Law — Fourth Amendment — Searches and Seizures — Exclusionary Rule — Independent Source Exception**

A division of the court of appeals considers whether the independent source doctrine applies to serial search warrants for the same evidence. The division concludes that, even where evidence was suppressed because it was discovered during execution of a flawed warrant, the same evidence may be admitted if discovered under a second warrant that was genuinely independent of the prior illegality. The record here supports the trial court's findings that (1) the second warrant was not based on facts learned in the unlawful search and (2) the officer's decision to seek the second warrant was not motivated by information obtained during the unlawful search. Therefore, the division affirms the

court's denial of the defendant's suppression motion.  The division

also rejects his other challenges to the judgment and sentence.

Court of Appeals No. 15CA0648
Jefferson County District Court No. 14CR559
Honorable Jeffrey R. Pilkington, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

James Dominguez-Castor,

Defendant-Appellant.

JUDGMENT AND SENTENCE AFFIRMED

Division IV
Opinion by JUDGE NAVARRO
Hawthorne and Furman, JJ., concur

Announced January 2, 2020

Philip J. Weiser, Attorney General, Carmen Moraleda, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Kamela Maktabi, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     The exclusionary rule generally bars admission of evidence obtained in violation of the Fourth Amendment.  Applying that rule, the trial court here suppressed evidence derived from a defective search warrant.  The police then obtained a second warrant to search the same property.  The court declined to suppress the product of the second warrant, which was the same evidence found under the first warrant.  This case thus presents the novel question whether the evidence procured under the second warrant was admissible under the independent source exception to the exclusionary rule.  We conclude that it was.

¶ 2     Because we also reject the other challenges to his convictions and sentence raised by the defendant, James Dominguez-Castor, we affirm the judgment and sentence.

## I.     Factual and Procedural History

¶ 3     On March 1, 2014, Robert Phippen was found dead inside his home.  He was seventy-nine years old.  Someone had stabbed him approximately sixty times, strangled him, and ransacked his trailer.  The police discovered an empty box of checks, bloody latex gloves in the toilet bowl, two knives in the kitchen, and a black glove under his body.

¶ 4 Investigators suspected Dominguez-Castor and Stephvon Atencio. In police interviews following his arrest, Atencio acknowledged having a sexual relationship with the victim and living with him shortly before his death. Atencio implicated Dominguez-Castor in the crimes. The prosecution ultimately charged both men in the victim's death. Atencio later agreed to testify against Dominguez-Castor and pleaded guilty to second degree murder.

¶ 5 At Dominguez-Castor's trial, Atencio testified that Dominguez-Castor texted him the night of February 24, 2014, asking for marijuana. They decided to smoke it at the victim's trailer. The victim allowed them in, and he joined them while they smoked and drank. After the victim retired for the evening, Atencio and Dominguez-Castor wanted more marijuana but had no money. Atencio proposed stealing the money from the victim.

¶ 6 Atencio attempted to steal the money from the victim's pocket as he slept, but Atencio abandoned that plan when the victim moved in his sleep. Dominguez-Castor said he could get the wallet; then he put on gloves, grabbed a knife, and went into the bedroom. Atencio heard a struggle lasting several minutes. When he returned

2

to the bedroom, he saw the bloodied victim lying on the floor. Dominguez-Castor flushed the gloves down the toilet before stealing the victim's money and checks.

¶ 7    The prosecution presented evidence showing that (1) Dominguez-Castor confessed the murder to a jailhouse informant and to a girl on Facebook; and (2) his DNA was on the latex gloves found in the toilet. Dominguez-Castor denied any involvement, denied being at the trailer, and denied making any confessions.

¶ 8    The jury convicted Dominguez-Castor of first degree murder (both after deliberation and felony murder), aggravated robbery, and related crimes. The trial court adjudicated him a habitual criminal and sentenced him accordingly.

## II.    Serial Search Warrants

¶ 9    We first address, and reject, Dominguez-Castor's contention that the trial court erred by denying his motion to suppress a Facebook message as the fruit of an unlawful search.

### A.    Additional Background

¶ 10    Police seized two cell phones discovered during a search incident to Dominguez-Castor's arrest. Following witness

interviews — including with Atencio and Dominguez-Castor — the lead detective (Detective Karen Turnbull) directed another detective to draft an affidavit for a warrant to search the phones. Based on that affidavit, a magistrate issued the warrant, and law enforcement officers attempted to download the phones' contents. The information on one phone could not be downloaded, but the other phone revealed an incriminating message in which Dominguez-Castor appeared to confess to murder.[1]

¶ 11 The incriminating message was sent via a social media application called Facebook Messenger. Upon discovering the message, Detective Turnbull prepared affidavits for a search warrant to Facebook and for orders for production of records to three cell phone providers. Per department policy, she copied and pasted information from the first affidavit when applying for the new warrant and orders. The warrant and orders were issued, but records from Facebook and the cell phone providers did not reveal any new incriminating information.

---

[1] The message reads, "I just killed a nigga and Im running."

¶ 12 Dominguez-Castor moved to suppress the Facebook message recovered pursuant to the search warrant for the phones as well as evidence seized under the subsequent search warrant and orders. The trial court granted his motion. The court found that the detective who prepared the original affidavit included false information that a witness had identified Dominguez-Castor in a photo lineup. In fact, the witness had identified Atencio in one lineup but had failed to identify Dominguez-Castor in another.

¶ 13 The court found that the detective did not intentionally make false statements but made them with reckless disregard for the truth. After redacting the false information in all the affidavits and any references to the Facebook message, the court decided that the remaining information did not establish probable cause to search. The court thus suppressed the evidence seized pursuant to the search warrants and orders for production.

¶ 14 After the suppression ruling, Detective Turnbull drafted a new affidavit and applied for a second warrant to search the phones.

The new affidavit included much more information than the first,[2] but omitted any reference to the Facebook message or any other information learned during the prior searches.

¶ 15    A magistrate issued the new warrant, and law enforcement officers re-downloaded information from the phone — including the Facebook message.  Dominguez-Castor again moved to suppress the evidence.  At the second suppression hearing, Detective Turnbull testified that she followed the "same pattern" of the investigation as before.  In other words, her first step was to obtain a warrant to download the phones.  She testified that nothing found in the initial search of the phones was used to obtain the second warrant for the phones.  The detective did not, however, seek new warrants to Facebook or the cell phone providers.  She explained that she had been unaware that evidence seized from those entities had been suppressed.  She also noted that "in hindsight" she knew those searches would reveal nothing valuable.

---

[2] Detective Turnbull later explained that, in the time between the first affidavit and the second, her department had received new training about search warrants for cell phones in light of the decision in *Riley v. California,* 573 U.S. 373 (2014).

¶ 16    The trial court denied the suppression motion on the ground that the second warrant to search the phones satisfied the independent source doctrine.  The court found that the new affidavit in support of the second warrant referenced no information obtained from the illegal search, Detective Turnbull's motive to secure a warrant was independent of the prior unlawful search, and the affidavit established probable cause to search.

## B.    Standard of Review

¶ 17    A trial court's suppression order presents a mixed question of fact and law.  *People v. Hyde*, 2017 CO 24, ¶ 9; *People v. Cruse*, 58 P.3d 1114, 1120 (Colo. App. 2002).  We review the court's findings of fact deferentially and accept them if they are supported by competent record evidence.  *People v. Chavez-Barragan*, 2016 CO 66, ¶ 34.  Because the ultimate conclusions of constitutional law are ours to draw, however, we review them de novo.  *Id.*

## C.    Analysis

¶ 18    Dominguez-Castor contends that the trial court erroneously applied the independent source doctrine to allow the prosecution to "circumvent" the first suppression order.  He says that, when a trial court suppresses evidence because of a defective warrant, the

exclusionary rule forbids law enforcement officers from seeking a new warrant to search for the same evidence. He further argues that, "[e]ven if the independent source doctrine permitted repeat warrants," the doctrine should not apply here because the prosecution did not establish that the second warrant was independent of the first. We disagree with both arguments.

### 1. May the Independent Source Doctrine Apply to Serial Search Warrants?

¶ 19    The exclusionary rule is a judicially created remedy designed to deter unlawful police conduct by suppressing evidence obtained in violation of the Fourth Amendment. *People v. Schoondermark*, 759 P.2d 715, 718 (Colo. 1988). It applies both to illegally obtained evidence and to derivative evidence — often called "fruit of the poisonous tree." *Id.* (quoting *Nardone v. United States*, 308 U.S. 338, 340-41 (1939)).

¶ 20    One exception to the exclusionary rule is the independent source doctrine, under which "unconstitutionally obtained evidence may be admitted if the prosecution can establish that it was also discovered by means independent of the illegality." *People v. Arapu*, 2012 CO 42, ¶ 32 (quoting *People v. Morley*, 4 P.3d 1078, 180 (Colo.

2000)).  Among other circumstances, the doctrine may apply where evidence was initially discovered during an unlawful warrantless entry or search but later seized (or re-seized) when the police executed a valid search warrant.  *See, e.g., Murray v. United States*, 487 U.S. 533, 540-42 (1988); *Arapu*, ¶ 32; *Schoondermark*, 759 P.2d at 716; *People v. George*, 2017 COA 75, ¶¶ 6-9, 47-55.

¶ 21    To show that the warrant was genuinely an independent source of the evidence, the prosecution must prove that (1) the decision to seek the warrant was not prompted by what was observed during the initial unlawful search, and (2) no information obtained during the initial search was relied upon by the magistrate in issuing the warrant.  *George*, ¶ 47.

¶ 22    This case raises the question whether the independent source doctrine can apply to evidence seized under a valid warrant issued after the evidence was first discovered during execution of an invalid warrant.  No published Colorado case has answered this question.  We conclude that the independent source doctrine may apply to such facts if the prosecution shows that the second warrant was truly independent of information obtained from the initial search.

9

¶ 23 Driving our decision is the reason for the independent source doctrine. The United States Supreme Court has explained that the public interest "in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced *by putting the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred.*" *Murray,* 487 U.S. at 537 (quoting *Nix v. Williams,* 467 U.S. 431, 443 (1984)) (emphasis added). If the challenged evidence has an independent source, excluding such evidence would put the police in a worse position than they would have been in absent any error or violation. *Id.*

¶ 24 This rationale applies with equal force to a second warrant that is independent of evidence discovered under an initial defective warrant. Where the second warrant would have been sought and issued even absent the first warrant, "[i]nvoking the exclusionary rule would put the police (and society) not in the *same* position they would have occupied if no violation occurred, but in a *worse* one." *Id.* at 541.

¶ 25 Contrary to Dominguez-Castor's view, permitting subsequent warrant applications would not eviscerate the exclusionary rule's

deterrence function by encouraging reckless applications for a first warrant. If the initial warrant was defective, the prosecution must satisfy "the much more onerous burden of convincing a trial court" that no information gained from the illegal search affected either the law enforcement officers' decision to seek a second warrant or the magistrate's decision to grant it. *George*, ¶ 64 (quoting *Murray*, 487 U.S. at 540). Reasonable officers would wish to avoid this burden and its heightened risk that evidence crucial to their investigation will be suppressed. *See id.*

¶ 26  Moreover, we decline to hold that, although the independent source doctrine may apply to evidence initially discovered during an unlawful *warrantless* search and later seized under a valid warrant, the doctrine may not apply to evidence initially discovered under a defective warrant and later seized under a valid warrant. Such a rule could create unwelcome incentives for law enforcement officers by discouraging them from seeking a warrant before an initial search. *Cf. People v. Marko*, 2015 COA 139, ¶ 145 ("To comply with the reasonableness requirement, the United States and Colorado Constitutions generally require a police officer to obtain a warrant before conducting a search."), *aff'd*, 2018 CO 97.

¶ 27    Consistent with our view, courts in other jurisdictions have recognized that the independent source doctrine may apply to evidence seized under a second warrant even though the evidence was initially discovered under a defective warrant.  *See United States v. Terry*, 41 F. Supp. 2d 859, 863-66 (C.D. Ill. 1999); *Commonwealth v. Henderson*, 47 A.3d 797, 800-05 (Pa. 2012);[3] *State v. Dasen*, 155 P.3d 1282, 1285-87 (Mont. 2007); *State v. Betancourth*, 413 P.3d 566, 572-73 (Wash. 2018).  We have not found any contrary authority.

¶ 28    Further, we disagree with Dominguez-Castor that applying the independent source doctrine to the second warrant would allow the police to "circumvent" the first suppression order.  As the trial court explained, "the People may seek multiple warrants for the same evidence," and they can "redraft and resubmit affidavits and search warrants where the Court [initially] refuses to issue the warrant."  Hence, it is neither improper nor unusual to resubmit a warrant

---

[3] When considering the independent source doctrine, Pennsylvania courts apply the test from *Murray v. United States*, 487 U.S. 533 (1988), as well as an additional "independent police team requirement."  *Commonwealth v. Henderson*, 47 A.2d 797, 798-99, 805 (Pa. 2012).  We cite *Henderson* only for its application of *Murray* to serial search warrants.

application with an improved affidavit after a court has ruled that the first affidavit was insufficient to show probable cause. This practice does not thwart the court's first probable cause ruling; it accepts and appropriately responds to that ruling.

¶ 29 Finally, we are not convinced that the analysis must differ where the first warrant was defective due to an officer's recklessly including false information in the first affidavit. We see no reason why the independent source doctrine should not apply so long as the prosecution proves that the second warrant was genuinely independent of the evidence found under the first. *See Murray*, 487 U.S. at 542 (holding that the independent source doctrine should apply "[s]o long as a later, lawful seizure is genuinely independent of an earlier, tainted one"). To conclude otherwise would put the police not in the same position they would have occupied if no violation had occurred, but in a worse one. *Id.* at 541.

¶ 30 Dominguez-Castor cites cases requiring suppression of evidence if the affidavit underlying the warrant does not show probable cause after false statements have been excised. *See, e.g., Franks v. Delaware*, 438 U.S. 154, 156 (1978). In that situation, it does not matter whether additional facts supporting probable cause

13

could have been alleged if they were not actually alleged in the affidavit. *See State v. Thompson*, 358 S.E.2d 815, 817 (W. Va. 1987). Consistent with this authority, the trial court here suppressed the results of the first warrant after excising the false statement from the first affidavit. But Dominguez-Castor cites no authority holding that the first suppression ruling precludes the police from submitting a second warrant application supported by a second affidavit without false statements.

¶ 31     We therefore hold that the independent source doctrine may apply to a search warrant sought after a court suppresses evidence seized under a prior warrant.

2.     Application of the Independent Source Doctrine

¶ 32     We now consider whether the second warrant in this case was in fact independent of the prior unlawful search.

¶ 33     Dominguez-Castor does not challenge the trial court's finding that the second warrant was supported by probable cause. And he concedes that the information in the second warrant application did not refer to evidence obtained from the unlawful search. Still, he maintains that the unlawful search prompted the second search.

14

¶ 34    Whether the police would have pursued a second search even absent what they discovered during an earlier unlawful search is a question of fact for the trial court. *Murray*, 487 U.S. at 543; *People v. Haack*, 2019 CO 52, ¶ 17. We will not disturb the court's finding if it has record support. *Chavez-Barragan*, ¶ 34.

¶ 35    The trial court found that "Detective Turnbull was not motivated by anything in the original illegal search to obtain the second warrant." Ample evidence supports the court's finding.

¶ 36    Detective Turnbull testified that she wanted to search the phones prior to the original search. The trial court found her testimony credible. Indeed, it is corroborated by the fact that the detective actually secured a search warrant for the phones, albeit a flawed one, before the first search. As the court determined, that the detective would have pursued a warrant even absent the information gained by the unlawful search was shown by the fact that she initially sought a warrant without such information. *See Morley*, 4 P.3d at 1081 (discerning an independent motive where officers sought a warrant before unlawful discovery of evidence); *State v. Smith*, 54 A.3d 772, 790 (N.J. 2012) ("That [the police] would have sought such a warrant as part of their normal

investigation is indicated by the fact that they did, in fact, seek such a warrant, even though the application itself was flawed."). This sequence of events rebuts an "inference that the warrant was sought and granted based upon facts gathered during the illegal searches." *Morley*, 4 P.3d at 1081.

¶ 37 Also, the record reveals that, independent of the evidence found in the first search, the police knew facts providing probable cause to search (and asserted those facts in the second affidavit). *See Arapu*, ¶ 32 (concluding that, where the redacted affidavit contained facts — independent of an officer's illegal observation — that established probable cause, the officer would have sought a warrant regardless of the illegal observation). Dominguez-Castor told the police he barely knew Atencio, whereas Atencio claimed he and Dominguez-Castor texted often. Determining which story was true — and therefore establishing the relationship between the two suspects — would reasonably prompt the police to search their phones' activity. In fact, Dominguez-Castor invited officers to "run" his phone to corroborate his story about his whereabouts on the relevant night.

¶ 38    Additionally, if the men texted as often as alleged, the police had reason to suspect from other circumstances that they may have discussed the robbery over the phone.  They had a history of stealing from the victim.  In fact, the victim once obtained a restraining order against Dominguez-Castor for stealing his checks and credit cards.  Some witnesses told the police that they suspected that Dominguez-Castor and Atencio had been stealing from the victim near the time of his death.  And, after the victim was killed, Dominguez-Castor attempted to cash checks stolen from the victim's trailer.[4]  These facts gave the police probable cause to believe that the cell phones contained evidence of criminal activity.  *See People v. Omwanda*, 2014 COA 128, ¶ 24.

¶ 39    Yet, Dominguez-Castor contends that the record does not support the trial court's finding that the first search did not prompt the second warrant application.  He points to Detective Turnbull's response to the court's question whether her decision to obtain the second warrant "was based on her desire to determine what was included within the cell phone."  She answered, "Technically, I knew

[4] Officers who were not involved in the first warrant application investigated the stolen checks.

what was included because I can't unknow what was included, but I still wanted to have evidence that was on the phone part of the offense." The fact that she already knew what was on the phone, however, did not preclude a finding that her desire to search the phone was not prompted by her knowledge of the phone's contents. If she would have sought the warrant even without such knowledge, the independent source doctrine could apply.

¶ 40 In *Murray* for instance, law enforcement officers, due to an illegal entry, knew about the evidence located in the place they wanted to search before they sought a warrant. *See* 487 U.S. at 535. Yet, the Court recognized the possibility that their decision to seek a warrant was not prompted by what they had seen during the illegal entry:

> Knowledge that the marijuana was in the warehouse was assuredly acquired at the time of the unlawful entry. But it was also acquired at the time of entry pursuant to the warrant, and if that later acquisition was not the result of the earlier entry there is no reason why the independent source doctrine should not apply.

*Id.* at 541. Therefore, many subsequent cases recognize that the independent source doctrine may apply even where the police already know about the evidence they seek via a warrant. *See, e.g.,*

18

*Arapu*, ¶¶ 3, 32; *Schoondermark*, 759 P.2d at 717, 719; *George*, ¶¶ 6-9, 65; *Dasen*, 155 P.3d at 1285-87.

¶ 41    For similar reasons, the fact that the same officers were involved in both warrants does not mean the independent source doctrine cannot apply.  Colorado and federal cases applying the doctrine have not required an independence of law enforcement personnel.  *See, e.g., Schoondermark*, 759 P.2d at 715 (officers involved in unlawful search sought a warrant); *see also Murray*, 487 U.S. at 543-44 (same).

¶ 42    Next, Dominguez-Castor argues that, because the decision to pursue a second warrant was motivated by the prior suppression ruling, it cannot be independent of the prior unlawful search.  But, "[w]hile the suppression order prompted the investigator to seek a warrant, the objective of avoiding the consequences of that order does not equate to an improper motive arising from the fruits of the unlawful search."  *George*, ¶ 53.  This is true because a court's determination that a search was unlawful is distinct from the information obtained during that search.  The independent source doctrine requires independence from only the latter.  *See United States v. Hanhardt*, 155 F. Supp. 2d 840, 852 (N.D. Ill. 2001)

(concluding that responding to a suppression ruling "is a valid reason to seek a warrant, and is not based on anything learned from the [unlawful] search"); *Dasen,* 155 P.3d at 1286 (Although "the invalidity of the first search necessitated a second warrant, the State nevertheless possessed sufficient independent information to 'purge the taint' of the first search.").

¶ 43    Finally, Dominguez-Castor contends that Detective Turnbull's decision not to renew warrant applications to the cell phone providers and Facebook shows that she was influenced by the unlawful searches.  He says that, because she knew nothing valuable would be obtained from these entities, she chose not to seek permission to search their records again.  But a law enforcement officer's decision *not* to conduct a search does not raise Fourth Amendment concerns, regardless of its motive.  The relevant question was whether the detective's decision to seek the second warrant to search the phones was prompted by illegally obtained evidence.  The trial court answered "no."  For the many reasons we have discussed, the record supports the court's ruling.

¶ 44    Accordingly, we affirm the trial court's order denying Dominguez-Castor's suppression motion.

### III. Authentication of Facebook Evidence

¶ 45 Dominguez-Castor's challenge to the Facebook messages does not end with the suppression issue. He acknowledges that the Facebook messages (including the apparent confession) were sent though an application on a phone found in his possession upon his arrest. But he argues "the record shows persons other than Dominguez-Castro had access to the . . . phone, thus creating ambiguity about authorship of the incriminating messages." So, Dominguez-Castor says, the prosecution failed to authenticate the Facebook evidence and the evidence was inadmissible hearsay. We conclude, however, that the trial court did not abuse its discretion by ruling otherwise.

#### A. Additional Background and the Trial Court's Ruling

¶ 46 The Facebook messages were sent to a teenage girl (G.E.) who testified at trial. She recalled receiving the messages and recognized the profile as belonging to Dominguez-Castor. Although she had never met him in person, she had extensive conversations with him through Facebook and text messages.

¶ 47 The prosecution presented an analyst to testify about the phone's security measures. The phone could be accessed only after

21

entering a four-digit passcode, but the applications on the phone —
including Facebook Messenger — could be accessed without
entering another password. In other words, even though the
Facebook Messenger account was password-protected, the
application on the phone employed an auto-login feature once a
user had accessed the phone.

¶ 48    The analyst noted that there was some evidence that
Dominguez-Castor and Atencio had shared the phone in the past.
The degree to which they shared the phone was unclear.

¶ 49    In addition to the foregoing testimony, the trial court pointed
to the following circumstances:

- The cell phone belonged to Dominguez-Castor, and he
  had it when he was arrested.

- The Facebook account was registered in Dominguez-
  Castor's name using his email address.

- The messages were sent through Facebook Messenger,
  an application on the phone.

- Although there were some calls made a few days before
  the murder to persons related to Atencio, there was no

evidence that Atencio used the phone between the dates of the murder and Dominguez-Castor's arrest.

- There was no evidence that Atencio knew the four-digit code to access the phone.

- The web history on the phone included a search for banks that cash third-party checks, which was consistent with Dominguez-Castor's behavior following the murder.

- The Facebook messages refer to Dominguez-Castor's plan to leave the state, and there was no trial evidence he told Atencio of his travel plans before the messages were sent.

- Some text messages on the phone contain a signature ("Killshit"), and G.E. said that nickname referred to Dominguez-Castor.

¶ 50     Based on the above, the court found that the prosecution had sufficiently authenticated the Facebook messages. The court also ruled that the content of the messages was not hearsay under CRE 801(d)(2) because it included Dominguez-Castor's statements, as well as G.E.'s statements necessary for context.

## B. Analysis

¶ 51 We review evidentiary rulings for an abuse of discretion. *Campbell v. People*, 2019 CO 66, ¶ 21. A trial court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair. *Id.*

¶ 52 The admissibility of the statements in the Facebook messages is governed by the rules of relevancy, authentication, and hearsay. *People v. Huehn*, 53 P.3d 733, 736 (Colo. App. 2006). Dominguez-Castor challenges only the latter two requirements.

¶ 53 Authentication is a condition precedent to admissibility of evidence. CRE 901. The proponent bears the burden to authenticate evidence, and that burden is satisfied by evidence sufficient to support a finding that the evidence in question is what its proponent claims. CRE 901(a). This burden "presents a low bar; 'only a prima facie showing is required.'" *People v. N.T.B.*, 2019 COA 150, ¶ 16 (quoting *People v. Glover*, 2015 COA 16, ¶ 13).

¶ 54 Rule 901 does not specify the exact nature or quantity of evidence required. *Id.* at ¶ 17. Rule 901 is a flexible standard, and the evidence necessary to authenticate a particular piece of evidence will always depend on context. *Id.* at ¶ 33.

¶ 55    When the prosecution seeks to admit a computer printout of social media communications of the defendant, the prosecution must make two showings for authentication: (1) the records were those of the social media platform and (2) the communications recorded therein were authored by the defendant. *Glover*, ¶ 23 (addressing Facebook).

¶ 56    Authorship presents an unusual challenge for authenticating social media communications due to the "ease with which someone can assume the identity of another on Facebook." *People in Interest of A.C.E-D.*, 2018 COA 157, ¶ 46. Thus, to demonstrate authorship in this context, "additional corroborating evidence of authorship is required beyond confirmation that the social networking account is registered to the party purporting to create those messages." *Glover*, ¶ 30.

¶ 57    Dominguez-Castor does not dispute that the messages here were communicated through Facebook. Therefore, we address only whether he authored the messages. *See id.* at ¶ 23.

¶ 58    The evidence tended to show that the sending Facebook account belonged to Dominguez-Castor. It was registered in his name and was created using an email associated with him. The

25

Facebook Messenger application on his phone automatically logged on to this profile. Conversations between Dominguez-Castor and G.E. often began over text and would continue on Facebook (or vice versa), which indicated that he used the Facebook profile. The record therefore supported a finding that Dominguez-Castor created and used the sending account.

¶ 59    As for additional corroborating evidence of authorship, the Facebook messages referenced Dominguez-Castor's post-murder travel plans, and no evidence at trial showed that he had told anyone about those plans. And recall that Dominguez-Castor does not dispute that the incriminating message was sent via the phone found in his possession when he was arrested.[5] Circumstantial evidence supported a finding that only he had access to that phone when the message was sent. To access the phone, a user must enter a four-digit passcode, which no one other than Dominguez-Castor knew. There was no evidence that Atencio used the phone after the murder, and he expressly denied doing so. Messages on

---

[5] The prosecution presented an activity log of the phone's internet history. Facebook Messenger requires access to the internet, and the log shows the phone logging onto public wifi mere minutes before the "confession" message was sent.

another texting application on the phone included a nickname that referred to Dominguez-Castor. The phone's internet search history included searches for cashing third-party checks, which was consistent with his later behavior.

¶ 60 In sum, the record includes evidence that the sending account belonged to Dominguez-Castor, messages referred to travel plans that only he knew, the "confession" message originated from a particular phone he owned, and only he had access to the phone when the message was sent. On this record, the trial court did not abuse its discretion by deciding that the prosecution made the prima facie showing necessary to authenticate the messages. Any remaining questions of authorship went to the weight of the evidence rather than its admissibility. *N.T.B.*, ¶ 16; *A.C.E-D.*, ¶ 50; *People v. Bernard*, 2013 COA 79, ¶ 12.

¶ 61 Lastly, because the record supports a finding that Dominguez-Castor authored the messages from the relevant Facebook account, we reject his challenge to the trial court's ruling that the evidence was admissible under CRE 801(d)(2)(A) as admissions by the opposing party. *See Glover*, ¶¶ 40-41. G.E.'s statements were

27

admissible because they were not hearsay but were admitted to give context to Dominguez-Castor's statements.  *See id.* at ¶ 42.

### IV.    Impeachment of Atencio

¶ 62    Dominguez-Castor argues the trial court violated his constitutional rights to present evidence and to confront the prosecution's evidence by excluding evidence he offered to impeach Atencio's credibility.  We do not discern constitutional error.

#### A.    Atencio's Guilty Plea and Cooperation Agreement

##### 1.    Additional Procedural History

¶ 63    Atencio originally faced charges similar to those against Dominguez-Castor, including first degree murder and aggravated robbery.  A week before he testified in this case, he pleaded guilty to second degree murder and conspiracy to commit aggravated robbery.  At Dominguez-Castor's trial, the prosecutor thoroughly examined Atencio regarding his guilty plea.  Atencio explained that he potentially faced life in prison for his original charges.  Under the plea agreement, however, the prosecutor would seek no more than forty-eight years.

¶ 64    As part of this negotiation, but before his guilty plea, Atencio entered into a cooperation agreement under which he was required

to testify at Dominguez-Castor's trial. If Atencio withheld information or otherwise did not cooperate with the prosecution, the prosecutor could withdraw from plea negotiations.

¶ 65    The cooperation agreement also included a "Statement of Understanding," in which Atencio acknowledged that, at the time he agreed to testify, no plea deals had yet been made. It further provided that his testimony would be truthful. Defense counsel objected to admitting this document, on hearsay grounds, and the trial court sustained the objection.

¶ 66    Attached to the documents was a twenty-four-page summary of Atencio's statements implicating Dominguez-Castor, which was consistent with Atencio's testimony. Still, after cross-examination, defense counsel sought to introduce this summary to impeach Atencio. Counsel argued that Atencio "was tied to this version of the events because it's written in his cooperation agreement." The prosecutor objected on hearsay grounds, noting that the first part of that same document had already been excluded based on the defense's objection. The court sustained the objection, ruling that the summary was inadmissible hearsay, that it referenced

inadmissible evidence, and that it should be excluded under CRE 403 because it posed an undue risk of confusing the jury.

### 2. Analysis

¶ 67    We review a possible Confrontation Clause violation de novo. *Bernal v. People*, 44 P.3d 184, 198 (Colo. 2002).

¶ 68    "The Sixth Amendment right to confrontation and the Fifth Amendment right to due process of law require only that the accused be permitted to introduce all relevant and admissible evidence." *People v. Harris*, 43 P.3d 221, 227 (Colo. 2002); *see also People v. Salazar*, 2012 CO 20, ¶ 17 (same). So, the exclusion of irrelevant or otherwise inadmissible evidence does not deprive the defendant of a constitutional right. *See Harris*, 43 P.3d at 227; *see also People v. Elmarr*, 2015 CO 53, ¶ 27 ("[T]he right to present a defense is generally subject to, and constrained by, familiar and well-established limits on the admissibility of evidence.").

¶ 69    We reject Dominguez-Castor's constitutional claim for two reasons. First, he does not challenge the trial court's ruling that the document he wished to admit was inadmissible hearsay. So, he has not demonstrated that the evidence was admissible.

¶ 70    Second, he has not demonstrated that any evidentiary error rose to the level of constitutional error.  A confrontation violation may exist where a defendant "was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness."  *Kinney v. People*, 187 P.3d 548, 559 (Colo. 2008) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986)).  Defendants in previous cases have successfully stated a constitutional violation only where "the trial court's ruling, under the circumstances of each case, effectively barred the defendant from meaningfully testing evidence central to establishing his guilt."  *Krutsinger v. People*, 219 P.3d 1054, 1062 (Colo. 2009).  In *Van Arsdall*, for instance, the Court discerned a confrontation violation "only because the trial court prohibited '*all* inquiry' into the possibility of prosecution bias by a witness."  *Krutsinger*, 219 P.3d at 1062 (quoting *Van Arsdall*, 475 U.S. at 679-80).

¶ 71    Dominguez-Castor, however, was not prohibited from demonstrating that Atencio's testimony might be influenced by his motive to preserve his plea deal.  Atencio admitted that he would avoid life in prison in exchange for testifying against Dominguez-

31

Castor. The prosecutor even elicited testimony from Atencio that his plea deal hinged on his cooperation with the prosecution. Atencio's potential bias and motivation for testifying were made clear to the jury.

¶ 72 Given the other evidence admitted, Dominguez-Castor has not persuasively shown that a "reasonable jury might have received a significantly different impression of [Atencio's] credibility" if the jury had heard the excluded evidence — especially considering that this evidence matched Atencio's testimony. *Krutsinger*, 219 P.3d at 1061 (quoting *Van Arsdall*, 475 U.S. at 679-80). And considering the extensive examination regarding the plea deal, the pretrial statements countered no "reasonable, but false, inferences" that Atencio was an otherwise credible witness. *Cf. Merritt v. People*, 842 P.2d 162, 168 (Colo. 1992) (witnesses with pending charges appeared to confess under oath). We therefore find no constitutional violation.

## B. The Ledger

¶ 73 Dominguez-Castor next contends that the trial court committed constitutional error by excluding a purported ledger listing payments the victim made to Atencio. He argues that the

32

ledger was admissible under the business records exception to hearsay. *See* CRE 803(6). We need not decide whether error occurred because, even if so, it did not rise to the level of constitutional error.

¶ 74 Dominguez-Castor contends that the ledger evidenced the financial relationship between Atencio and the victim, and thus supported the defense theory that Atencio had a motive to murder the victim. But that financial relationship was thoroughly examined at trial even without the ledger. Atencio testified that he would grant the victim sexual favors in return for money. He also detailed the maintenance work he did for the victim and the payment he received in return. It was also well established that Atencio often lived with the victim. Defense counsel pointed to these facts in closing.

¶ 75 Because the ledger was cumulative of other evidence, excluding it did not keep facts crucial to the defense from the jury or deprive Dominguez-Castro of any meaningful opportunity to

present a complete defense. *See People v. Conyac*, 2014 COA 8M,

¶ 93. There was no constitutional error.[6]

## V. Detective Turnbull's Opinion Testimony

¶ 76 We likewise reject Dominguez-Castor's claim that the trial court reversibly erred when it permitted the lead investigator to state her opinion that the motive for the murder was robbery.

¶ 77 The defense theorized that Atencio murdered the victim to end the allegedly unwanted sexual contact between the two. Over the prosecutor's objection, the trial court permitted defense counsel to ask the detective whether a hypothetical person would feel angry about an unwanted sexual contact. The detective agreed that it was possible for a person to feel that way.

¶ 78 On redirect, the prosecutor asked, "In your assessment of the information in this case, is the sexual contact a motive for this murder?" Defense counsel objected. The court overruled the objection on the ground that defense counsel had "opened the door

---

[6] For similar reasons, we conclude that any ordinary evidentiary error was harmless. *See Hagos v. People*, 2012 CO 63, ¶ 12 (nonconstitutional error is harmless unless it substantially influenced the verdict or affected the fairness of the trial proceedings).

in [cross]-examination as to motive in all areas." The detective answered that "the motive in this case was robbery and not unwanted sexual contact."

¶ 79 Dominguez-Castor contends that the court erroneously permitted the detective to present lay witness testimony regarding motive. The People counter that the court properly determined that defense counsel opened the door to that matter. We need not determine who is correct because the alleged error was harmless. *See Hagos v. People*, 2012 CO 63, ¶ 12 (nonconstitutional error is harmless unless it substantially influenced the verdict or affected the fairness of the trial proceedings).

¶ 80 The challenged statement was an isolated one in a lengthy trial. *See People v. Munsey*, 232 P.3d 113, 124 (Colo. App. 2009) (unlikely that isolated impropriety substantially influenced the verdict). The prosecutor did not refer to the detective's statement in closing. *Cf. Wend v. People*, 235 P.3d 1089, 1099 (Colo. 2010) (repeating improper statement in closing compounded its prejudicial effect). Instead, the prosecutor attempted to rebut Dominguez-Castor's theory with facts that tended to show that Atencio had no motive to kill the victim. Specifically, the prosecutor

drew attention to the stability and income that the victim provided Atencio.

¶ 81 In addition, the jury was able to form its own opinion of Atencio's feelings about his sexual contacts with the victim. On cross-examination, Atencio testified in detail that he "disliked" — but did not "hate" — the sexual contact between him and the victim. From that testimony, the jury had the opportunity to gauge Atencio's credibility on that point. *See People v. Gallegos*, 644 P.2d 920, 927 (Colo. 1982) (deciding that jury's ability to directly assess witness at trial alleviated prejudicial effect of officer's testimony implying that witness's accusation was credible). In addition, the jury received proper credibility instructions, including an instruction that it was not bound to the opinions of witnesses.

¶ 82 Finally, the strength of the evidence of guilt militates against a finding of prejudice from the detective's single statement. Substantial evidence pointed to Dominguez-Castor as the killer. He confessed the murder both to a Facebook friend and a jailhouse informant. His DNA, but not Atencio's, was extracted from a bloody glove found in the trailer. And Dominguez-Castor attempted to cash checks taken from the victim's trailer.

36

¶ 83     In light of the strength of the evidence and the surrounding circumstances, we are confident that the detective's isolated statement did not substantially influence the verdict or affect the fairness of the trial.

## VI.     Prosecutor's Comments in Voir Dire

¶ 84     We now turn to Dominguez-Castor's allegation of prosecutorial misconduct.  During voir dire of prospective jurors, the prosecutor attempted to explain the element of deliberation by having the jurors play the game of rock-paper-scissors and then discussing their decision-making processes.  The prosecutor apparently intended the analogy to demonstrate that reflection and judgment can occur quickly.  Defense counsel did not object.  Although we do not endorse the prosecutor's analogy, it does not require reversal.

¶ 85     Where a claim of error is not preserved by a contemporaneous objection, we may reverse only if plain error occurred.  *Hagos*, ¶ 14.  An error is plain if it is obvious, substantial, and so undermined the fundamental fairness of a trial as to cast serious doubt on the reliability of the conviction.  *Liggett v. People*, 135 P.3d 725, 733 (Colo. 2006).

¶ 86    Plain error review for prosecutorial misconduct requires us to examine the totality of the circumstances, with particular attention to the exact language used, the nature of the misconduct, the surrounding context, and the strength of the other evidence of guilt. *Wend*, 235 P.3d at 1098; *Domingo-Gomez v. People*, 125 P.3d 1043, 1053 (Colo. 2005).  Prosecutorial misconduct is plain error only if it is "flagrantly, glaringly, or tremendously improper."  *Domingo-Gomez*, 125 P.3d at 1053 (citation omitted).

¶ 87    Along with first degree felony murder, Dominguez-Castor was charged with first degree murder "[a]fter deliberation."  § 18-3-102(1)(a), C.R.S. 2019.  "The term 'after deliberation' means not only intentionally but also that the decision to commit the act has been made after the exercise of reflection and judgment concerning the act.  An act committed after deliberation is never one which has been committed in a hasty or impulsive manner."  § 18-3-101(3), C.R.S. 2019.

¶ 88    Using an analogy to explain the concept of deliberation can be problematic, especially where it might trivialize the reflection and judgment necessary to commit first degree murder.  *See People v. McBride*, 228 P.3d 216, 224-25 (Colo. App. 2009); *People v.*

*Cevallos-Acosta*, 140 P.3d 116, 123 (Colo. App. 2005). Even so, Dominguez-Castor has not shown that the analogy used here was so prejudicial as to require reversal. *See People v. Boykins*, 140 P.3d 87, 95 (Colo. App. 2005) ("In review for plain error, the defendant has the burden of persuasion with respect to prejudice.").

¶ 89 Preceding the analogy was the prosecutor's lengthy discussion stressing the statutory requirements of reflection and judgment. When the prosecutor presented the rock-paper-scissors analogy, one prospective juror pushed back, citing the serious charges. At the end of that discussion, the prosecutor clarified that the analogy was intended merely to demonstrate that thought processes can occur quickly. The prosecutor then returned to the concept of reflection and judgment according to the statute.

¶ 90 Considering the entire context, the record reveals that the prospective jurors were adequately informed of the distinction between a rash decision and a choice made after reflection. Indeed, some prospective jurors drew that distinction expressly.

¶ 91 Moreover, the prosecutor mentioned the analogy only during voir dire. Rather than repeat it in closing, the prosecutor read the statute and walked through the elements. *People v. Van Meter*,

2018 COA 13, ¶ 33 (finding no plain error where analogy was not repeated after voir dire); *cf. McBride*, 228 P.3d at 224 (finding that repeating the analogy in closing amplified prejudice). In addition, the trial court instructed the jury on the proper definition of deliberation. *People v. Carter*, 2015 COA 24M-2, ¶¶ 59-61 (holding that instructions can cure prejudice from isolated and improper analogy). Absent a contrary showing, we presume that the jury followed that instruction. *Cevallos-Acosta*, 140 P.3d at 123.

¶ 92    Finally, the strength of the evidence of deliberation weighs against a finding of plain error. The jury heard evidence that Dominguez-Castor and Atencio discussed robbing the victim. When Atencio was unsuccessful, Dominguez-Castor put on latex gloves, grabbed a knife, and went to the bedroom. The ensuing struggle lasted for several minutes, and the victim was ultimately stabbed more than sixty times. From these circumstances, the jury had ample evidence to conclude that the decision to kill was not made hastily or impulsively.

¶ 93    Given these circumstances and the strength of the evidence, we cannot say that the prosecutor's isolated use of the analogy was

so prejudicial as to cast serious doubt on the reliability of the conviction. *See Liggett,* 135 P.3d at 733.[7]

## VII. Denial of Mistrial

¶ 94 We also reject Dominguez-Castor's view that the trial court erred by denying his motion for a mistrial after a juror fainted while viewing autopsy photos of the victim.

¶ 95 A mistrial is a drastic remedy warranted only where "the prejudice to the accused is too substantial to be remedied by other means." *People v. Collins,* 730 P.2d 293, 303 (Colo. 1986). We review a trial court's denial of a mistrial for an abuse of discretion. *People v. Pernell,* 2014 COA 157, ¶ 24, *aff'd,* 2018 CO 13.

¶ 96 Dominguez-Castor's mistrial motion was not prompted by improper evidence or conduct but by a juror's reaction to admissible evidence: autopsy photos tending to show the victim's cause of death and the killer's culpable mental state. *See, e.g.,*

---

[7] We also note that the remedy for the alleged error would simply be a remand for the trial court to enter a conviction for first degree murder-felony murder, rather than first degree murder-after deliberation. Neither the felony level of Dominguez-Castor's offense nor his sentence would change.

*People v. Ruibal*, 2015 COA 55, ¶¶ 47-49 (admitting autopsy photos for such purposes), *aff'd*, 2018 CO 93.[8]

¶ 97    The court carefully managed the fainting incident.  It canvassed the jury and determined — on an individual basis — whether each juror could continue to be fair and impartial after the fainting episode.  *Van Meter*, ¶ 15 (canvassing the jury is a means to cure prejudice without declaring a mistrial).  The court determined that the jury, including the juror who fainted, would not base its decision on any sympathy toward the victim or prejudice against Dominguez-Castor.  Because the record provides support for the court's decision, we do not discern an abuse of discretion.  *See People v. Tillery*, 231 P.3d 36, 43 (Colo. App. 2009) (trial court is best positioned to evaluate the impact of trial events on the jury), *aff'd sub nom. People v. Simon*, 266 P.3d 1099 (Colo. 2011).

### VIII.  Constitutionality of Habitual Criminal Statutes

¶ 98    Finally, Dominguez-Castor contends for the first time on appeal that Colorado's habitual criminal statutes are

---

[8] The trial court had excluded, under CRE 403, four of the fourteen tendered autopsy photographs.  A juror fainted while viewing a photo the court found highly probative and helpful to the jury.

unconstitutional on their face and as applied to him because they authorize a judge, rather than a jury, to make the factual findings necessary for a habitual criminal adjudication. He says this procedure violates the rule of *Apprendi v. New Jersey*, 530 U.S. 466 (2000). We think his claim is foreclosed by our supreme court's precedent recognizing the continued vitality of *Apprendi*'s prior conviction exception. *See, e.g., Lopez v. People*, 113 P.3d 713, 723 (Colo. 2005). In any event, the alleged error was not obvious under plain error analysis given the many cases rejecting this claim. *See People v. Poindexter*, 2013 COA 93, ¶¶ 72-73 (collecting cases).

## IX. Conclusion

¶ 99 The judgment of conviction and sentence are affirmed.

JUDGE HAWTHORNE and JUDGE FURMAN concur.