24CA0053 Peo in Interest of ZRM 07-25-2024 COLORADO COURT OF APPEALS Court of Appeals No. 24CA0053 Mesa County District Court No. 22JV31 Honorable Valerie J. Robison, Judge The People of the State of Colorado, Appellee, In the Interest of Z.R.M., a Child, and Concerning E.J.B. and D.W.M., Appellants. JUDGMENT AFFIRMED Division II Opinion by JUDGE GROVE Fox and Sullivan, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced July 25, 2024 Todd M. Starr, County Attorney, Brad Junge, Assistant County Attorney, Grand Junction, Colorado, for Appellee Jenna L. Mazzucca, Guardian Ad Litem Joel M. Pratt, Office of Respondent Parents’ Counsel, Colorado Springs, Colorado, for Appellant E.J.B. Lindsey Parlin, Office of Respondent Parents’ Counsel, Denver, Colorado, for Appellant D.W.M. 
1 ¶ 1 In this dependency and neglect action, E.J.B. (mother) and D.W.M. (father) appeal the judgment terminating their parent-child legal relationships with Z.R.M. (the child). We affirm. I. Background ¶ 2 The Mesa County Department of Human Services (the Department) filed a petition in dependency and neglect, alleging concerns about neglect and substance abuse. The Department also alleged that both parents were arrested on warrants for criminal child abuse, leaving the child without a legal caregiver. ¶ 3 The juvenile court granted temporary custody of the child to the Department for placement with the paternal grandfather. Less than a month later, the court granted the Department’s motion to move the child to a foster care placement provider based on concerns that the paternal grandfather was leaving the child in the care of the paternal aunt, who it claimed was “an unapproved and inappropriate” family member. The child was moved to a kinship placement provider about a year after the petition was filed, and remained there at the time of the termination hearing. ¶ 4 The juvenile court adjudicated the child dependent and neglected and adopted treatment plans for both parents. 
2 ¶ 5 The Department later moved to terminate both parents’ parental rights. Twenty-one months after the petition was filed, the juvenile court terminated mother’s and father’s parental rights following a contested hearing. II. Reasonable Efforts ¶ 6 Mother first contends that the juvenile court erred by finding the Department made reasonable efforts to rehabilitate her. Specifically, she argues that the Department did not provide reasonable accommodations under the Americans with Disabilities Act (ADA) and failed to help her secure income or housing independent from father. We address each claim in turn. A. Standard of Review and Applicable Law ¶ 7 Whether a juvenile court properly terminated parental rights presents a mixed question of fact and law because it involves application of the termination statute to evidentiary facts. People in Interest of A.M. v. T.M., 2021 CO 14, ¶ 15. “We review the juvenile court’s findings of evidentiary fact — the raw, historical data underlying the controversy — for clear error and accept them if they have record support.” People in Interest of S.R.N.J-S., 2020 COA 12, ¶ 10. But we review de novo the court’s legal conclusions based on 
3 those facts. See id. In particular, the ultimate determination of whether a department provided reasonable efforts is a legal conclusion we review de novo. People in Interest of A.S.L., 2022 COA 146, ¶ 8. ¶ 8 It is for the juvenile court, as the trier of fact, to determine the sufficiency, probative effect, and weight of the evidence and to assess witness credibility. People in Interest of A.J.L., 243 P.3d 244, 249-50 (Colo. 2010). ¶ 9 Before the juvenile court may terminate parental rights under section 19-3-604(1)(c), C.R.S. 2023, a department of human services must make reasonable efforts to rehabilitate the parent and reunite the family. §§ 19-1-103(114), 19-3-100.5(1), 19-3-208, 19-3-604(2)(h), C.R.S. 2023. Reasonable efforts means the “exercise of diligence and care” for a child who is in out-of-home placement, and the reasonable efforts standard is satisfied when services are provided in accordance with section 19-3-208. § 19-1-103(114). ¶ 10 When a department knows or should know that a parent has a qualifying disability, it has an affirmative duty to make reasonable accommodations for that parent when providing rehabilitative 
4 services. People in Interest of S.K., 2019 COA 36, ¶¶ 22, 25, 34; see 42 U.S.C. § 12102(1) (defining “disability” under the ADA); see also 42 U.S.C. § 12131(2) (defining “qualified individual” under the ADA). When a parent is found to be a qualified individual, the juvenile court must consider whether a department made reasonable accommodations for a parent’s disability when determining whether it made reasonable efforts. S.K., ¶ 34. ¶ 11 For a parent to benefit from a reasonable accommodation, the parent must raise the ADA’s applicability as early in the proceedings as possible. See People in Interest of S.Z.S., 2022 COA 133, ¶ 16. “The Department can accommodate, and the juvenile court can address, only disabilities that are known to them.” S.K., ¶ 22. ¶ 12 The parent is ultimately responsible for using the provided services to obtain the assistance needed to comply with the treatment plan. People in Interest of J.C.R., 259 P.3d 1279, 1285 (Colo. App. 2011). The juvenile court may therefore consider a parent’s unwillingness to participate in treatment when determining whether a department made reasonable efforts. See People in Interest of A.V., 2012 COA 210, ¶ 12. 
5 B. Analysis ¶ 13 The juvenile court found that the Department made reasonable efforts but, despite those efforts, mother did not become fit to parent the child. The court found that those efforts included providing structured family time with three different providers, life skills services, substance testing, substance abuse and mental health assessments and services, capacity to parent evaluations, bus passes, and assistance in applying for a Housing Authority voucher. 1. Accommodations Related to Mother’s Disabilities ¶ 14 Mother contends that the Department knew that she had diagnosed mental health concerns, a seizure disorder, and was severely injured when she was hit by a drunk driver. She claims that the juvenile court erred by finding the Department made reasonable efforts because the record does not clearly demonstrate that the services offered to her accommodated her medical and mental health conditions. ¶ 15 Mother correctly argues that when a parent’s disability is obvious, the Department is required under the ADA to provide reasonable accommodations. S.K., ¶ 22. 
6 ¶ 16 But here, no ADA-cognizable disability was obvious. When the Department asked mother about possibly needing accommodations, she told the Department she did not need any. Mother stipulated to the appropriateness of her treatment plan. At no point during the nearly two years that the action was open did mother ask the juvenile court to recognize or provide a reasonable accommodation for any disability that might have been connected to her medical or mental health diagnoses. ¶ 17 Mother did not provide any evidence at the termination hearing regarding either her possible status as a qualified individual under the ADA or reasonable accommodations that might have been made by the Department. In her closing argument at the termination hearing, mother referred to case law regarding the Department’s obligation to provide reasonable accommodations. But even then, she did not argue that the ADA applied to her or that the Department should have made any accommodations when delivering services to her. ¶ 18 Thus, it is unclear whether the juvenile court knew it needed to make specific factual findings or legal conclusions about the applicability of the ADA related to mother’s medical or mental 
7 health concerns, including whether she was a “qualified individual” under the ADA, or what accommodations would have been warranted to further assist her. See S.Z.S., ¶ 18. ¶ 19 Even on appeal, it is unclear what impacts mother is claiming and what accommodations she thinks should have been made. Mother argues, without providing any support, that “shifting that burden to [her] to identify accommodations would be improper.” However, a parent is responsible for disclosing to the Department and the juvenile court information regarding a disability and any reasonable accommodations that are needed to address the disability. See S.Z.S., ¶ 16; see also S.K., ¶ 22. ¶ 20 Nonetheless, the record reveals that the Department made reasonable efforts to address mother’s mental health and medical diagnoses. See S.K., ¶ 22. The treatment plan proposed by the Department and adopted by the juvenile court included objectives to address mother’s untreated physical and mental health concerns. The caseworker maintained regular contact with mother and reminded her of appointments. The Department provided bus passes and offered to reimburse mother for transportation to family time. And the caseworker made referrals for a wide range of 
8 services, including for life skills, which could have provided additional support for any issues that mother disclosed needing help with. ¶ 21 The Department attempted to provide mother with necessary services to address her medical and mental health concerns, but she did not consistently participate in those services. Under these circumstances, the Department met its reasonable efforts obligation. See J.C.R., 259 P.3d at 1285 (the parent is ultimately responsible for using the provided services to obtain the assistance needed to comply with the treatment plan); see also A.V., ¶ 12 (the court may consider a parent’s unwillingness to participate in treatment when determining whether a department made reasonable efforts). 2. Mother’s Basic Needs ¶ 22 Mother next argues that the Department failed to make reasonable efforts because it made “minimal effort” to help her obtain housing or stabilize her income. She asserts that she could not benefit from any services offered by the Department “when she could not even meet her basic needs,” and that the Department’s 
9 failure to “help [her] meet her basic needs for food and shelter fatally infected its other efforts to rehabilitate her.” ¶ 23 The juvenile court specifically considered mother’s argument that the Department should have been required to assist mother with housing. The court found that “it is not within the purview of this case or within the reasonable requirements of a treatment plan to require a housing authority to authorize a housing voucher, or that [the Department] provide housing for respondent parents. There is no legal authority provided to indicate such a condition should have been” required. ¶ 24 We are not aware of, nor does mother provide, any authority to suggest that a department is required to provide housing or direct financial assistance as part of its reasonable efforts obligation. Instead, if deemed necessary and appropriate by a parent’s individual case plan, a department must provide “information and referral services to available public and private assistance resources,” § 19-3-208(2)(b)(III). ¶ 25 The record supports the juvenile court’s findings that the Department met this obligation. The Department referred mother for a housing voucher through the Housing Authority and helped 
10 her fill out the required application. When mother was denied a housing voucher because of her criminal history, the Department offered to reimburse mother for application fees or rent. The Department also referred mother to life skills services, which could have helped her connect with other community services. While mother now urges us to consider whether she was unwilling to engage in life skills services because her disability prevented her from understanding its value, we decline to do so. People in Interest of T.E.R., 2013 COA 73, ¶ 30 (generally, issues not raised in the trial court will not be considered on appeal) 3. Effect on Mother’s Fitness ¶ 26 Mother argues that, because the Department did not provide reasonable efforts, it failed to demonstrate that she could not become fit within a reasonable time if provided with appropriate services. Because we discern no error in the juvenile court’s reasonable efforts findings, we decline to further consider mother’s fitness argument. 
11 III. Fit in a Reasonable Period of Time ¶ 27 Father contends that the juvenile court erred by finding that he was unlikely to become fit within a reasonable time. We discern no error. A. Applicable Law ¶ 28 An unfit parent is one whose conduct or condition renders the parent “unable or unwilling to give the child reasonable parental care to include, at a minimum, nurturing and safe parenting sufficiently adequate to meet the child’s physical, emotional, and mental health needs and conditions.” § 19-3-604(2). A parent need not comply absolutely with every provision of a treatment plan, but partial or even substantial compliance may not result in a successful plan that renders a parent fit. People in Interest of D.L.C., 70 P.3d 584, 588 (Colo. App. 2003). ¶ 29 In determining whether a parent’s conduct or condition is likely to change within a reasonable time, “the court may consider whether any change has occurred during the proceeding, the parent’s social history, and the chronic or long-term nature of the parent’s conduct or condition.” S.Z.S., ¶ 24. 
12 ¶ 30 What constitutes a reasonable time is fact specific and must be determined by considering the child’s physical, mental, and emotional conditions and needs. Id. at ¶ 25. A “reasonable time” is not an indefinite time. Id. And even when a parent has made recent progress on a treatment plan, the court is not required to give the parent additional time to comply. See id. at ¶¶ 24-25. B. Analysis ¶ 31 Father asserts that he could become fit within a reasonable time because he completed a co-occurring assessment, participated in some substance abuse treatment, engaged in court hearings and Department meetings, and attended family time. ¶ 32 The juvenile court found that father was not likely to become fit within a reasonable time. In doing so, the court found that father attempted to “deflect any accountability,” continued to have legal issues, and had not addressed his substance abuse. The court specifically considered, and rejected, giving father more time to become fit as a less drastic alternative to termination, finding that doing so would not be in the child’s best interests. ¶ 33 The record supports these findings. Father testified that he did not complete inpatient or outpatient programs for substance 
13 abuse. The caseworker acknowledged that father completed a co-
occurring assessment, but testified that he did not follow any of the recommendations for treatment. Although the treatment plan was adopted more than a year before termination, father was not compliant with any of the treatment plan objectives. The caseworker testified that father wanted to become fit within a reasonable time but “he lacks a lot of accountability and the ability to make those changes in a reasonable amount of time.” ¶ 34 And because the child was under the age of six when the petition was filed, the expedited permanency planning provisions applied. §§ 19-1-102(1.6), 19-1-123, C.R.S. 2023. The provisions required the juvenile court to place the child in a permanent home as expeditiously as possible. § 19-3-702(5)(c), C.R.S. 2023. As the court noted, the child had been in out of home placement for all twenty-one months of the case. ¶ 35 Given this evidence, we conclude that the record supports the juvenile court’s findings, and we perceive no error in the court’s legal conclusion that father was unlikely to become fit within a reasonable time. 
14 ¶ 36 Father further claims that that he should have been given extra time to complete his treatment plan because (1) the objectives of his treatment plan required significant time to make progress; (2) he was hampered by transportation and housing barriers; and (3) “his significant commitment and progress” implicated a due process right to continue working on his treatment plan. However, because he did not present these arguments to the juvenile court, we will not consider them here. T.E.R., ¶ 30 (generally, issues not raised in the trial court will not be considered on appeal). IV. Less Drastic Alternative ¶ 37 Both parents assert that the juvenile court erred by finding there was no less drastic alternative to termination. Specifically, they argue that (1) the child would have benefited from a continued relationship with them; (2) paternal relatives were available to accept an allocation of parental responsibilities (APR); and (3) the kinship placement provider was not “fully apprised” of the APR option and did not refuse to accept an APR. We discern no basis for reversal. 
15 A. Applicable Law and Standard of Review ¶ 38 Consideration of less drastic alternatives is implicit in the statutory criteria for termination. A.M., ¶ 19. When considering less drastic alternatives, the juvenile court bases its decision on the best interests of the child, giving primary consideration to the child’s physical, mental, and emotional conditions and needs. § 19-3-604(3). A court may consider and weigh various factors in determining the viability of a less drastic alternative, including whether (1) a less drastic alternative is available, People in Interest of D.P., 160 P.3d 351, 356 (Colo. App. 2007); (2) an ongoing relationship with the parent would be beneficial or detrimental to the child, People in Interest of B.H., 2021 CO 39, ¶ 81; and (3) the alternative option provides the child with adequate permanency or meets the child’s needs, People in Interest of T.E.M., 124 P.3d 905, 910 (Colo. App. 2005). ¶ 39 To aid the court in making this determination, the Department must evaluate a reasonable number of persons the parent identifies as placement options. People in Interest of D.B
-
J., 89 P.3d 530, 532 (Colo. App. 2004). Even when a placement provider is willing to enter into a permanent custody agreement with a parent, the court 
16 may properly determine that such an arrangement does not adequately meet the needs of the child. See T.E.M., 124 P.3d at 910 (permanent placement with a relative may not be a viable alternative if it does not provide adequate permanence or otherwise meet the child’s needs); D.B-J., 89 P.3d at 532 (a proposed placement is not a less drastic alternative to termination if the placement provider lacks appreciation of a parent’s problems or a child’s needs and conditions). ¶ 40 A primary consideration of a child’s conditions and needs “requires more than a mere assessment of adequacy.” A.M., ¶ 31. If a juvenile court considers a less drastic alternative and finds that termination and not the proposed less drastic alternative is in the child’s best interests, it must reject the alternative and order termination. Id. at ¶¶ 32, 37. ¶ 41 When the juvenile court considers the availability of a less drastic alternative and still determines that the termination of a parent’s rights would be in the child’s best interests, we are bound to affirm the court’s decision if its findings have record support. B.H., ¶ 80. 
17 B. Analysis ¶ 42 The juvenile court took “a careful look at whether a less drastic alternative would be in the best interest of the child.” The court considered a potential APR and a guardianship and giving additional time for the parents to become fit. The court noted that it was especially “cognizant of the relationship the child has with her parents.” ¶ 43 The juvenile court nonetheless found that there was no less drastic alternative to termination that would meet the child’s needs. The court found that the child worried about her parents, and not “knowing where she stands [was] impacting her significantly.” Although the court considered placement with a different relative who might accept an APR, it ultimately determined that a different placement would not be appropriate or meet the child’s needs. The child needed permanency which, for her, could only be assured through adoption. Allowing the parents to retain some parental responsibilities would not provide the child with the stability that she needed. ¶ 44 The record supports these findings. The child’s therapist testified that the child’s high level of worry for and enmeshment 
18 with her parents was concerning. Although the therapist agreed that repairing the ruptures in the relationship between the child and the parents was important “if it can happen,” the therapist testified that the child was uncomfortable with the therapist’s attempts to integrate the parents into therapeutic work and asked that her parents not come back to therapeutic sessions. The therapist opined that, for any repair to be successful, the parents would need to do their own “therapeutic work fully,” which they had not done. The child’s therapist testified that it was not helpful for children to stay in a “stressful, distressing, overwhelming situation waiting for something to happen” or to stay in foster care “for years and years and years.” The child’s therapist opined that the child’s anxiety increased as the case went on and that “feeling very powerless about what’s going to happen, and being in the unknown and not knowing, . . . has had a lot of toll on [the child] psychologically.” ¶ 45 Mother and father contend that the record also demonstrated that the child wanted contact with them and would have benefited from an ongoing relationship with them. While there is some record support for these contentions, we cannot reweigh evidence or 
19 substitute our own judgment for that of the juvenile court. See People in Interest of K.L.W., 2021 COA 56, ¶ 62. ¶ 46 We are not persuaded by father’s contention that the Department “did not properly investigate or explore the paternal aunt as a less drastic alternative” because “no home study was ever performed by the Department.” We are not aware of any requirement that a department complete a home study as part of its evaluation of either placement providers or less drastic alternatives, and father provides no support for this proposition. Instead, the record makes clear that the Department knew about the paternal aunt’s availability and decided not to pursue placement of the child with her because of (1) the paternal aunt’s participation in events that led to the child’s removal from the paternal grandfather’s home; (2) department regulations that precluded placement with the paternal aunt because of her criminal history that included child abuse; and (3) mother and father’s requests early in the case that the child not be placed with the paternal aunt. Regardless of any placement decision, the less drastic alternative of permanent custody was considered and rejected by the juvenile court, with record support as discussed above. 
20 ¶ 47 Similarly, we reject the parents’ arguments about the kinship placement provider’s knowledge about an APR. Father argues that a less drastic alternative was not properly explored because the kinship placement providers “did not have an accurate or meaningful understanding” of what an APR would involve because they did not consult with an attorney. In a similar argument, mother contends that the juvenile court erred by rejecting less drastic alternatives because the kinship placement provider testified they preferred adoption but did not specifically testify that they would not accept an APR. But we are not aware of, and neither parent provides support for, any requirement that these steps be followed before a placement provider develops a preference for adoption or permanent custody. Furthermore, a placement provider’s preference is only one of many factors that may be considered by the juvenile court. See People in Interest of S.N-V., 300 P.3d 911, 920 (Colo. App. 2011). And, although the kinship placement provider testified their preference was for adoption, the court did not mention this preference in either its oral or written judgment. 
21 ¶ 48 Mother contends that the juvenile court erred by finding that the child “would be subject to instability with an APR rather than a termination or adoption” because, if true, “the entire domestic relations system under Title 14 provides instability to children.” Mother does not provide, and we are not aware of, any support for her contention. ¶ 49 While an APR can provide adequate permanency for some children, a juvenile court must make an individual determination for each child, giving primary consideration to that child’s physical, mental, and emotional needs. § 19-3-604(3); see People in Interest of J.L.M., 143 P.3d 1125, 1126 (Colo. App. 2006); see also T.E.M., 124 P.3d at 910 (permanent placement with a relative may not be a viable alternative if it does not provide adequate permanence or otherwise meet the child’s needs); A.M., ¶ 31 (“Primary consideration of the child’s physical, mental, and emotional condition and needs requires more than a mere assessment of adequacy in order to satisfy the overall intent of the Children’s Code.”). ¶ 50 Here, the juvenile court found “the child needs a permanent stable home that can be assured only through adoption. To place 
22 the child with a family member or to allow [mother and father] some parental responsibilities doesn’t provide the child the stability she needs.” These findings are appropriately specific to this child and her family members and, as described above, are supported by the record. ¶ 51 Because the record supports the juvenile court’s findings, we conclude the court did not err in finding that clear and convincing evidence showed no less drastic alternative to termination existed for this specific child. See B.H., ¶ 80. V. Disposition ¶ 52 The judgment is affirmed. JUDGE FOX and JUDGE SULLIVAN concur.