21CA1483 Peo v Rhee 07-18-2024 COLORADO COURT OF APPEALS Court of Appeals No. 21CA1483 City and County of Denver District Court No. 10CR1678 Honorable Christopher J. Munch, Judge The People of the State of Colorado, Plaintiff-Appellee, v. Joong Hee Rhee, Defendant-Appellant. ORDER AFFIRMED Division VI Opinion by JUSTICE MARTINEZ* Lipinsky and Schutz, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced July 18, 2024 Philip J. Weiser, Attorney General, Alejandro Sorg, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee Hillary C. Aizenman, Alternate Defense Counsel, Boulder, Colorado, for Defendant-Appellant *Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2023. 
 1 ¶ 1 Defendant, Jong Hee Rhee, appeals the postconviction court’s order denying his Crim. P. 35(c) petition. We affirm. I. Background ¶ 2 On March 27, 2010, Hae Choon Park called Rhee, his friend and business associate, and insisted that Rhee meet him at Rhee’s office. Rhee later said that Park was angry with him after Rhee had recently threatened to record a deed of trust on one of Park’s properties in Utah. Park, who owed Rhee $300,000, was upset that Rhee had waited eight years to record the deed of trust. ¶ 3 After a physical altercation, Rhee killed Park in the office and drove Park’s body to a remote location in Utah. Afterwards, Rhee attempted to clean the blood from his office and car. ¶ 4 In April 2011, a retired U.S. Forest Service employee discovered a bone near the side of a frontage road in Utah. He notified law enforcement authorities, who found human bones and clothing strewn out over a large area. Dr. Todd Grey, Utah’s Chief Medical Examiner, and Derinna Kopp, Utah’s Forensic Anthropologist, examined the bones. Kopp said she believed the bones were from an Asian male, approximately sixty to seventy 
 2 years old, that had been exposed to the elements for between one and five years. The remains were later identified as those of Park. ¶ 5 Rhee was tried twice for first degree murder, first degree assault, and tampering with evidence. ¶ 6 At the first trial, Rhee was convicted of tampering, but the court declared a mistrial when the jury could not reach a verdict on the other two charges. ¶ 7 At the second trial, Rhee was convicted of second degree murder and first degree assault. ¶ 8 In both trials, the main theory of defense was self-defense. Rhee had two attorneys at trial. ¶ 9 The Colorado Court of Appeals affirmed Rhee’s convictions. People v. Rhee, (Colo. App. No. 13CA0569, July 9, 2015) (not published pursuant to C.A.R. 35(f)). ¶ 10 Rhee filed a pro se Crim. P. 35(c) petition for postconviction relief, to which his court-appointed postconviction counsel filed a supplement. Postconviction counsel’s petition alleged ineffective assistance of trial counsel for failing to (1) investigate Rhee’s mental condition at the time of the offense and to present expert testimony regarding post-traumatic stress disorder (PTSD); (2) confront and 
 3 rebut the opinion testimony of the prosecution’s expert witness on bloodstain patterns; and (3) confront or rebut the testimony of the prosecution’s economic crimes investigator. Postconviction counsel also raised a claim of cumulative error. ¶ 11 The postconviction court held a Crim. P. 35(c) hearing on June 22-23, 2021. After the hearing, the postconviction court denied Rhee’s petition, ruling that trial counsel was not deficient for failing to investigate and pursue a mental health or PTSD defense or for failing to confront and rebut expert testimony on bloodstain patterns. The postconviction court also found that Rhee did not establish deficient performance or prejudice regarding trial counsel’s failure to confront the prosecution’s economic expert. ¶ 12 Rhee contends on appeal that he is entitled to postconviction relief because trial counsel provided ineffective assistance by failing to (1) investigate and present mental health evidence; (2) investigate, confront, and counter the prosecution’s bloodstain pattern evidence; and (3) confront and counter the prosecution’s financial and real estate evidence. Rhee also alleges that the cumulative failures of trial counsel constituted ineffective assistance of counsel. We affirm. 
 4 II. Analysis A. Standard of Review and Controlling Law ¶ 13 “A criminal defendant is constitutionally entitled to the effective assistance of counsel.” People v. Houser, 2020 COA 128, ¶ 27; see U.S. Const. amends. VI, XIV; Colo. Const. art. II, § 16; Strickland v. Washington, 466 U.S. 668, 686 (1984). “The purpose of this constitutional guarantee is to ensure the accused a level of assistance calculated to produce a fair and just result in a criminal prosecution.” People v. Garcia, 815 P.2d 937, 940 (Colo. 1991). ¶ 14 Ineffective assistance of counsel claims present a mixed question of fact and law. Strickland, 466 U.S. at 687. We review factual findings for an abuse of discretion. Carmichael v. People, 206 P.3d 800, 808 (Colo. 2009). But we review de novo whether counsel’s performance was deficient and resulted in prejudice. Id. ¶ 15 We also defer to the postconviction court’s determinations regarding the weight and credibility to give witness testimony at the hearing. Dunlap v. People, 173 P.3d 1054, 1061-62 (Colo. 2007). ¶ 16 To prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel’s performance was constitutionally deficient and that the deficient performance 
 5 prejudiced the defense. Strickland, 466 U.S. at 687. For the performance prong, the defendant must show by a preponderance of the evidence that counsel’s representation fell below an objective standard of reasonableness. Id. at 688; Dunlap, 173 P.3d at 1061. Generally, there is a strong presumption that counsel’s decisions fell within a wide range of reasonable possibilities. Dunlap, 173 P.3d at 1063. For the prejudice prong, the defendant must show a reasonable probability that, but for counsel’s errors, the result of the proceeding would have been different. Strickland, 466 U.S. at 694. ¶ 17 Trial counsel “has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel’s judgments.” Id. at 691. ¶ 18 To show that counsel’s failure to investigate caused prejudice, the defendant must allege that the investigation would have uncovered evidence that would have affected the outcome of the proceeding. See People v. Pendleton, 2015 COA 154, ¶ 34; see also 
 6 People v. Chambers, 900 P.2d 1249, 1252 (Colo. App. 1994) (“Unless [additional] investigation would have discovered substantial evidence which . . . might reasonably have led to a different result,” the failure to conduct such an investigation is not prejudicial.). B. Mental Condition and PTSD Evidence ¶ 19 Rhee contends that trial counsel was ineffective for failing to investigate and present evidence of Rhee’s mental condition and PTSD diagnosis. We disagree. 1. Additional Facts ¶ 20 Trial counsel raised the issue of Rhee’s competency before the first trial. Dr. Jane Cleveland conducted a court-ordered competency examination. After Dr. Cleveland spoke with Rhee for three hours during one visit and one and a half hours during a second visit, she concluded that Rhee was competent to stand trial. Dr. Cleveland also diagnosed Rhee with PTSD. Trial counsel then hired Dr. Karen Fukutaki to conduct a second evaluation. Dr. Fukutaki determined that Rhee was not competent to stand trial and also opined that he might suffer from PTSD. 
 7 ¶ 21 On March 9 and 16, 2012, the trial court held a competency hearing and found Rhee competent to proceed. ¶ 22 After trial at the Crim. P. 35(c) hearing, Dr. Cleveland testified that, after meeting with Rhee again three times in 2021, she diagnosed him with PTSD based on his then-current presentation and his “historical representation of his experiences and symptoms.” Dr. Cleveland also said it was highly likely that PTSD or a trauma response affected Rhee during the murder. ¶ 23 Trial counsel testified that, shortly before the first trial setting, Rhee was unable to retain any information from court hearings. Concerned, trial counsel raised competency. But trial counsel testified that they did not “see anything that raised red flags for me about him suffering from a mental condition at the time of the incident.” Further, trial counsel noted that Dr. Fukutaki’s report indicated that there was no way to distinguish whether Rhee’s PTSD developed from the incident and being in jail or from previous trauma. Trial counsel also testified that, due to some tension between Dr. Cleveland and Dr. Fukutaki’s reports, combined with the amount of time that trial counsel had spent with Rhee and Rhee’s insistence that he acted in self-defense, trial counsel did not 
 8 consider Rhee’s mental condition or PTSD to be a compelling defense. Trial counsel further expressed concern about Rhee being interviewed at the state hospital and providing inconsistent statements that could be used against him at trial. Finally, trial counsel testified that they did not believe that a mental condition or PTSD defense would support the objective prong of the self-defense analysis.
1 ¶ 24 The postconviction court found that Rhee did not meet the first Strickland prong. Specifically, the postconviction court found that, while it is probable that Rhee suffered from PTSD and that trial counsel could have identified, endorsed, and presented an expert to prove it, trial counsel reasonably concluded that presenting evidence of his disorder would have not been helpful to the defense for three reasons. First, while PTSD evidence might have been useful in defeating the culpable mental state necessary 1 Under the self-defense statute, a person may use “[d]eadly physical force” if he “reasonably believes a lesser degree of force is inadequate” and if he “has reasonable ground to believe, and does believe, that he . . . is in imminent danger of being killed or receiving great bodily injury.” § 18-1-704(2)(a), C.R.S. 2023. Therefore, self-defense by use of deadly physical force considers both the reasonable belief and the actual belief of the defendant. People v. Darbe, 62 P.3d 1006, 1010 (Colo. App. 2002). 
 9 to establish first degree murder, trial counsel never believed that the evidence supported a first degree murder conviction. Second, trial counsel determined that Rhee’s testimony would be crucial to any self-defense argument regarding the second degree murder charge. Endorsing a theory of mental condition and PTSD would necessitate a pretrial commitment with detailed questioning about the murder. The statements Rhee made during a commitment would therefore be available for the prosecution to use in cross-examination, creating a risk of exposing inconsistent statements. Third, trial counsel concluded that the potential harm to the objective prong of self-defense outweighed the advantage of using mental condition and PTSD evidence for the subjective prong. ¶ 25 The record supports the postconviction court’s findings. 2. Analysis ¶ 26 We conclude that Rhee has not overcome the strong presumption that trial counsel had a valid trial strategy by not investigating or presenting evidence of Rhee’s mental condition or diagnosis of PTSD. See Ardolino v. People, 69 P.3d 73, 79 (Colo. 2003) (defense counsel must overcome the presumption that trial counsel’s conduct might be considered a sound trial strategy under 
 10 the circumstances). Trial counsel offered credible reasons for their decision not to investigate or pursue a mental condition or PTSD defense, including, but not limited to, the differences between the reports of Dr. Clevland and Dr. Fukutaki, the concern for inconsistent statements, and the belief that a mental condition or PTSD defense would not support the objective prong of the self-defense theory. ¶ 27 The postconviction court credited trial counsel’s testimony. We defer to the court’s determinations regarding the weight and credibility of witness testimony at the hearing. See Dunlap, 173 P.3d at 1061-62. It was trial counsel’s strategic decision to focus on the theory of self-defense instead of Rhee’s mental condition or PTSD diagnosis. While Rhee might not agree with trial counsel’s strategy, and in hindsight it may not have been the best defense, Rhee has nonetheless failed to overcome the presumption that this was “sound trial strategy.” Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). ¶ 28 Accordingly, Rhee’s claim regarding the mental capacity and PTSD evidence fails the first prong of the Strickland analysis, and the postconviction court did not err by denying such claim. 
 11 C. Bloodstain Pattern Analysis ¶ 29 Rhee next contends that trial counsel provided ineffective assistance by failing to investigate, confront, and counter the prosecution’s bloodstain pattern evidence. We are unpersuaded. 1. Additional Facts ¶ 30 Before trial, counsel met with John Koziol from Koziol Forensics, who had a background in blood spatter analysis and expertise in crime scene reconstruction. Koziol reviewed the conclusions of the prosecution’s blood pattern analysis expert, Jonathyn Priest, and advised trial counsel how to handle Priest’s testimony. Koziol also advised trial counsel to read a book on bloodstain pattern analysis written by one of Koziol’s mentors. ¶ 31 At the first trial, the court qualified Priest as an expert in blood pattern analysis and crime scene reconstruction. Priest testified, from the bloodstain pattern analysis alone, that there was a minimum of three blows to Park’s head. Trial counsel objected to this testimony, asserting that it was outside Priest’s expertise. The next day, after viewing photographs of Park’s skull, Priest testified that Park suffered seven blows to the head. ¶ 32 The following colloquy occurred on cross–examination: 
 12 TRIAL COUNSEL: I want to talk about and review some of what we discussed yesterday. Bloodstain pattern analysis is not considered a science, per se; is that right? PRIEST: Technical discipline based on science. TRIAL COUNSEL: Very good. And there are inherent limitations on blood stain pattern analysis; would you agree with that? PRIEST: Yes. TRIAL COUNSEL: And one of the problems in this discipline is that there is never — they will never have a true standard to be able to compare your findings with, correct? PRIEST: Correct. . . . . TRIAL COUNSEL: Okay. And, again, speaking of limitations, when you’re doing reconstruction, you’re seeking to define and speak about physical events that you were not obviously present to observe happen, correct? PRIEST: Correct. And a big limitation for an analyst is — we’re really like an archeologist coming in way after the fact and trying to uncover the evidence that’s going to support what happened. TRIAL COUNSEL: Very good. Because you were not there when the events actually happened, it’s important to remember that events at a scene like this are very dynamic; would you agree with that? 
 13 PRIEST: Can be. TRIAL COUNSEL: Okay. And any number of similar events may produce the results you find? PRIEST: Yes. TRIAL COUNSEL: And would you agree also that even in the best circumstances, the nature of the evidence will probably provide only a glimpse into the past, a glimpse into what actually — everything that transpired that day in that office? PRIEST: If we’re talking about this scene here, there was certainly limited evidence for analysis. But that is certainly not necessarily typical of a given crime scene. ¶ 33 At the second trial, Priest testified that Park’s head would have been near the office floor and the blows inflicted while he was lying face down. Before Priest testified, trial counsel objected to Priest’s opinion as to the number of blows to Park’s skull. The court denied the objection but said that defense counsel could object contemporaneously if Priest gave that testimony. Priest then testified that, from the bloodstain pattern analysis alone, the minimum number of blows to Park’s skull was three. However, after examining the damage to the skull, Priest testified, as he had 
 14 at the first trial, that the minimum number of blows to the skull was seven. ¶ 34 On cross-examination, trial counsel engaged Priest as follows: TRIAL COUNSEL: And you’d agree that — well, you’ve been able to extrapolate certain information from the crime scene. It’s more often the case that there’s more that you don’t know at the end of the day; is that right? PRIEST: That’s accurate, yes. TRIAL COUNSEL: And there’s — and with your work in terms of blood spatter analysis there’s inherent limitations in terms of the work you can do with that; correct? PRIEST: Yes. TRIAL COUNSEL: And bloodstain pattern analysis, while it’s based in science, is not scientific in itself; is that correct? PRIEST: Well, it depends on who you talk to on the stand. But my response to the question is it is a technical discipline based in science. ¶ 35 Dr. Grey, whom the court qualified as an expert in forensic pathology, testified that, due to the absence of bone and “inability to really piece together how many different fracture lines there are,” he could not opine as to the number of repeated impacts to Park’s skull. Dr. Grey testified that all he could tell is that there were multiple impacts — “more than two.” 
 15 ¶ 36 Kopp also testified that she could not opine as to how many times Park was struck. Kopp stated, “I cannot. I can say it’s multiple, which is more than two, but I cannot say how many.” When asked if she could give an exact answer, Kopp responded, “No.” ¶ 37 In closing argument, trial counsel stated the following: We heard from Ms. Kopp and Dr. Grey that there were at least two blows to Mr. Park’s head. One of them is the medical expert for Utah. He’s been practicing in this field for years, decades. He has a tremendous amount of experience. She has a Ph.D. or close to a Ph.D., and, as you heard her testify, has done an extensive amount of work with skeletonized remains determining cause of death, time of death. And what they can tell you is at least two blows. You heard from Lieutenant Priest — who’s not trained in skeletal remains, he’s not trained in looking at bones — that that figure was much higher. Seven blows. You heard the district attorneys rely on that, and they’re going to continue to rely on that. But Lieutenant Priest does not have the formal training or experience to opine on that kind of fact. Dr. Grey and Ms. Kopp, who can tell you with certainty based on their medical training and experience, that it was at least two. 
 16 ¶ 38 At the Crim. P. 35(c) hearing, Richard Eikelenboom testified as an expert on bloodstain pattern analysis. Eikelenboom testified that he did not agree with Priest’s bloodstain pattern analysis. Specifically, Eikelenboom stated that the cleaning of the office carpet and use of water made it impossible to estimate the amount of blood on the carpet or the mechanism used to cause the bleeding. Eikelenboom further testified that the bloodstain pattern evidence did not support Priest’s conclusion about the location of Park’s head when it was struck. Finally, Eikelenboom testified that Priest’s testimony as to the number of blows to the head was outside Priest’s range of expertise. ¶ 39 Christopher McKee was qualified as an expert in the practice of criminal defense and the intersection of law and forensic sciences. McKee testified that trial counsel’s performance was deficient and that it prejudiced Rhee. McKee opined that, at the time of the murder and the two trials, there were discussions in the legal community concerning the validity and accuracy of forensic sciences. These discussions led to a 2009 National Academy of Sciences report called “Strengthening Forensic Science in the United States: A Path Forward” (the NAS report). The NAS report 
 17 included a section on bloodstain pattern analysis that concluded the uncertainties associated with bloodstain pattern analysis are “enormous.” McKee opined that, by the time of Rhee’s trials, all competent defense counsel would have been aware of the NAS report because there were many trainings and discussions around it across the country, including in Colorado. ¶ 40 At the Crim. P. 35(c) hearing, postconviction counsel asked trial counsel if Priest’s testimony attacked the defense’s self-defense theory. Trial counsel answered in the negative. The questioning and testimony continued: POSTCONVICTION COUNSEL: So you do not agree that testimony that the victim was crawling under the desk and was in a defensive stance lying on the ground while being beaten from 2 feet away seven times in the head, you don’t think that is inconsistent with self defense? TRIAL COUNSEL: Well, I think that there’s some conflation there, first of all. So, one, once you are able to use force against another person because you are being threatened, you do not have to stop using that force until the threat is mitigated. So you can use deadly force. Did I like the fact that that testimony came out. No, not necessarily . . . . Do we really want to hire an expert that on cross-exam may end up giving the same sort of testimony and answers that Priest did? 
 18 . . . . But you’re saying that it’s junk science, but we should get another junk scientist to come possibly be crossed and give the same information. ¶ 41 Further, trial counsel testified that their strategy was to show the jury that, “while there may be certain things that you might be able to decipher from the bloodstain pattern analysis evidence, there’s much more that you can’t find . . . and at the end of the day . . . you know less than you do know about what exactly occurred at this crime scene.” ¶ 42 Moreover, trial counsel testified they decided to go with a consultant rather than a testifying expert to avoid a “battle of the experts.” ¶ 43 The postconviction court found that Rhee failed to meet the first Strickland prong. The postconviction court also found that trial counsel’s decision to challenge Priest on cross-examination and not to pursue a “battle of the experts” was within the range of constitutionally adequate representation. 
 19 2. Analysis ¶ 44 Again, the record supports the postconviction court’s findings. Contrary to Rhee’s assertion, trial counsel conducted a pretrial investigation by consulting with Koziol, a crime scene reconstructionist familiar with bloodstain pattern analysis. Koziol gave trial counsel advice about Priest and aided in formulating counsel’s cross-examination strategy. Trial counsel’s decision to consult with Koziol and then not call an expert witness to avoid a “battle of the experts” was not outside the range of professionally competent assistance. See People v. Bradley, 25 P.3d 1271, 1276 (Colo. App. 2001) (whether to call an expert witness is a tactical decision within the discretion of trial counsel). ¶ 45 Moreover, while trial counsel had no knowledge of the NAS report, trial counsel conducted a thorough cross-examination that elicited concessions from Priest concerning the invalidity of bloodstain pattern analysis. Specifically, Priest acknowledged that often there is much more to a crime scene than what bloodstain pattern analysis can determine. Further, Priest conceded that a wide range of events, including those different than what Priest concluded, could have resulted in the bloodstain patterns in Rhee’s 
 20 office. Finally, in closing, trial counsel challenged Priest’s expertise in opining on the number of blows to Park’s head. ¶ 46 Accordingly, the postconviction court did not err by denying Rhee’s claim regarding the bloodstain pattern analysis. D. Financial and Real Estate Testimony ¶ 47 Next, Rhee argues that trial counsel provided ineffective assistance by failing to consult with or present an expert to confront and counter the prosecution’s financial and real estate evidence. Again, we disagree. 1. Additional Facts ¶ 48 Before trial, trial counsel discussed the case with a property law professor at the University of Denver. ¶ 49 At the first trial, Teresa Wertsch, a senior criminal investigator with the Economic Crimes Unit in the Denver District Attorney’s Office, testified for the prosecution regarding Rhee’s financial dealings. Wertsch testified that, on March 29, 2002, to secure a $300,000 debt that Park owed Rhee, Rhee obtained from Park a deed of trust purportedly encumbering vacant land in Utah. But Rhee did not record the deed of trust until March 25, 2010 — two days before Park’s murder. Wertsch also testified that the deed of 
 21 trust was invalid because Park did not own the encumbered property at the time he signed the deed of trust. ¶ 50 Wertsch also testified at the second trial. Again, Wertsch testified that the deed of trust was invalid. ¶ 51 At the Crim. P. 35(c) hearing, Ronald Merrill, whom the court qualified as an expert in real estate law, testified for the defense. He had written two memorandums concerning Wertsch’s testimony. Merrill testified that, even though Wertsch provided expert opinions about real estate documents and transactions, she had not been qualified as an expert. Merrill disagreed with several aspects of Wertsch’s testimony, stated that her testimony was inaccurate and misleading, and said he believed that trial counsel was ineffective by failing to adequately counter her testimony. Merrill pointed to numerous inaccuracies in Wertsch’s testimony, including her conclusion that the deed of trust was invalid. ¶ 52 In addition, McKee agreed with Merrill that trial counsel was deficient by failing to effectively challenge Wertsch’s assertions at trial. ¶ 53 Trial counsel testified that he did not need to counter Wertsch’s testimony by establishing that the deed of trust was valid 
 22 because “Mr. Rhee and Mr. Park believed it was valid and believed it had importance and that was all that mattered.” ¶ 54 When asked whether trial counsel considered retaining a professor or some other expert to comment on the validity of the deed of trust, trial counsel responded: No. It seemed to me that would just muddy the waters. If all the sudden we have a battle of the experts over an issue that has nothing to do with ultimately the self-defense argument, I don’t know why I would put an expert on to say that the document that caused the death of Mr. Park was invalid. I don’t see how that strengthens my case. ¶ 55 Trial counsel went on to say, If I had brought somebody in and they said — confirmed that filing a Colorado form in Utah, where there are different laws and different procedures and it was filled out ambiguously, again, I don’t see how heightening that aspect improves my case when what I needed was the jury to understand that Mr. Park and Mr. Rhee believed this was an important document, that it had some legal significance, and there were $300,000 at stake for a man who was drowning in debt. ¶ 56 The postconviction court found that Wertsch’s testimony evidenced a misunderstanding of basic property law and would have been easy to rebut with expert testimony. However, the court 
 23 found that the prosecution’s evidence was equally as useful to the defense as it was to the prosecution and did not achieve the effect the prosecution sought. The postconviction court determined that trial counsel did not believe that Wertsch’s testimony hurt the case. Further, the postconviction court found that the decision to impeach a readily impeachable witness, who has done no material harm to the defense — rather than calling a competing expert witness — is inherently within the discretion of trial counsel and that deference is to be given to that decision unless it is unreasonable. 2. Analysis ¶ 57 The decision to call an expert is a tactical decision within the discretion of trial counsel. See Bradley, 25 P.3d at 1276. Trial counsel consulted with a law professor from the University of Denver and then decided not to call an expert witness. This falls within the realm of professionally competent assistance. See id. ¶ 58 Moreover, as stated above, to establish ineffective assistance of counsel, the defendant must overcome the strong presumption that counsel’s challenged conduct may be considered sound trial strategy under the circumstances. Ardolino, 69 P.3d at 78. At the 
 24 Crim. P. 35(c) hearing, trial counsel testified that they did not introduce an expert in real estate law because they did not want to detract from the defense’s theory of self-defense. Trial counsel believed that the issue of whether the deed of trust was valid was insignificant to the defense’s overall trial strategy — the key issue was that Park believed it was valid and that Rhee would foreclose on the property. The postconviction court credited counsel’s testimony regarding trial strategy. We defer to the postconviction court’s determinations regarding the weight and credibility to give witness testimony at the hearing. Dunlap, 173 P.3d at 1061-62. ¶ 59 Accordingly, Rhee’s claim regarding not calling an expert to testify concerning the legality of the deed of trust fails the first prong of the Strickland analysis, and the court did not err by denying the claim. III. Cumulative Error ¶ 60 Finally, Rhee contends that the cumulative effect of counsel’s errors deprived Rhee of effective assistance of counsel. We reject this contention because we discern no ineffective assistance of trial counsel. See People v. Walton, 167 P.3d 163, 169 (Colo. App. 2007). 
 25 IV. Disposition ¶ 61 The order is affirmed. JUDGE LIPINSKY and JUDGE SCHUTZ concur.